5-640-321-0060 The following case is James Reichert Ltd. Family Partnership v. Illinois Pollution Control Board. Please be seated. Good afternoon. The next case is James Reichert Ltd. Family Partnership v. Illinois Pollution Control Board at all. 5-1605-330. And that's the way to go, I'm assuming. So, is it Mr. Osmond? Yes, Your Honor. If you're ready, you may proceed. Good afternoon, Your Honor. Counsel, ladies, may it please the Court, I'm Ronald E. Osmond of the law firm of Ronald E. Osmond & Associates, and I represent the Reichert Ltd. Partnership, and throughout this argument, I'm going to refer to that as Reichert for Mr. Reichert, just for simplicity. This is a case for direct review of a decision entered by the Illinois Pollution Control Board on December 18, 2015, after an administrative hearing held in Marion, Illinois, on June 8, 2016. The Pollution Control Board ruled, in part, that my client, James Reichert, Ltd. Partnership, caused or allowed the open dumping of waste on its property that resulted in litter, open burning, and deposition and construction of demolition debris. That was their hold, The decision was that a citing factor, according to the Pollution Control Board, was based solely on its belief that Reichert was capable of exerting control over the property, and now, according to the brief of the Pollution Control Board, that belief is based solely on the fact that Reichert cleaned up the property after being directed to do so by Maggie Stephenson, who is an investigator with the local EPA office. Now, this is very, very direct questions here, Your Honor, and I'm probably going to, for the first time in my life, finish early. I normally don't do that, but we'll see if I can do that or not. I'll give you a brief description of the property and kind of the setting. This is located in Marion, Illinois, and it's a small strip shopping center, for lack of a better word. It consists of three units, A, B, and C. And Unit A was leased by Air Gas Corporation. Unit B was leased by a satellite company, and Unit C, not involved in this, was leased by someone else. Reichert is the owner of the property. The burn area that we're talking about is about three feet by five feet. I wish we had a picture of it in here, because it's just recharging some satellite screws and bolts that are laying in the area. This investigation was started by a satellite picture with, according to the testimony of Maggie Stephenson, where she viewed the satellite picture, and then she went to the site. At the hearing, Maggie Stephenson was the only witness for the EPA. James Reichert was the only witness for Reichert. And the testimony, and I'm going to just hit the highlights. It's pretty well set out in my brief. But at the hearing, Maggie Stephenson based her decision to cite Reichert solely on her belief that Reichert personally did the burning, and that as the owner of the property, he was absolutely liable under EPA rules. Now, if you look into my brief, there's a pretty lengthy question and answer from me to her about her belief that that was the case. She indicated she'd been told that by her supervisor. She felt she had a directive to that effect, and in fact, we know that's not the case. But that was her soul. That was the two theories that she had. Then when it came down to the testimony about Mr. Reichert personally doing the burning, she testified that she originally cited, and the respondent was Air Gas, Unit A. She sent them a notice of violation, and she testified she sent Mr. Reichert a notice of violation. He testified he never received it. She didn't blame the notices because she said they were all irrelevant in the record. She didn't bring anything to the hearing except her inspection report. She testified that she called after she sent the notice of violation to Air Gas that, quote, the manager called her and said we didn't do it. And then she gets a call from the risk management from Air Gas who comes in to meet in her office and tells her we didn't do it. You know, we're Unit A. This is Unit B. Based upon that testimony, she drops Air Gas as a respondent, doesn't go to try and find the satellite company and make them a respondent. She merely then says, and she writes up a report, it's all hearsay. As a matter of fact, if you remember our evidence, it's double hearsay. We get two votes. Counsel, on the hearsay or the double hearsay, at the hearing, I know you cross-examined her. Correct. It seems like maybe some of your questions invited the hearsay responses, or would you disagree with that? No, Your Honor, I wouldn't, because I'm in a position now that they have no evidence here. I have to put something on the record. I have to do something. Yes, I invited those hearsay responses, but it doesn't make it admissible because I invited it. I mean, hearsay is hearsay, and so it does not make it admissible. And there was nothing else that was going to be in the record in that case, but yes, you're correct. But you will see in the record I preserve my hearsay objections every time. It's in the record that I preserve those, especially in regards to her report that I allowed the report in, but I reserve my objections to the hearsay. Well, then, as I say, after the testimony of Ms. Stevenson, in my opinion, is pretty suspect because it appears that she believed, and she sincerely believed that, you know, if you're the owner of the property, you're strictly liable. Now, she didn't use strictly liable word, but she said you're liable. In fact, after she did that, she didn't care. She had her man. She's going to write it all up. Did a very sloppy job. Didn't follow up on anything. I mean, didn't follow up with the satellite company. Believed what she was told by Airgas. Did not believe what she was told by Mr. Rackert, which was directly contradictory. So she determined that she's an arbitrator of the truth. So now then we get forward to where we're now in a position where we appeal it, and the pollution control board attorneys see, ooh, we've got a problem here. We can't base it on hearsay. You know, we have to have other evidence. We can't base it on hearsay. She's incorrect about strict liability. So they now come up with the theory that because he cleaned it up, he controlled it. And since he controlled it to clean it up, he therefore must have controlled it at the time it was going on. Circular argument. Now, the problem with that is, is that there's no evidence in the record anywhere to support that Mr. Rackert controlled the property, except their argument that he ended up, chose control, and therefore it was, he had control of it. But there is evidence, uncontroverted evidence, from testimony by Mr. Rackert, not in any manner, you know, disproven or anything else, that direct evidence that he did not, one, personally burn anything. Two, he did not talk to anybody from Air Desk and did not tell them that he was going to burn pallets and that he never took anything to the property site and burned it. Now, that's uncontroverted evidence. Cross-examination didn't show any prejudice, bias. And that's what's in the record. So the code now is to apply the standard against the manifest way of the evidence. The only evidence is Rackert's. There is no evidence that he had any other control except their circular argument. Now, let me just talk about that for a minute. What kind of policy would it be if you're cited by the EPA and there's a violation out there, and it's an ongoing violation, and if you don't remedy, you continue to get fined every day, and you get a call from the EPA and you say, what can I do? This is in the transcript. And she says, clean it up. She goes out and cleans it up. And they say, see, you had control because you went out and cleaned it up. Now, if that's the policy that the EPA wants to set, I would submit to you, no, I'm never going to control, clean up anything. Now, this is, as Judge Easterbrook would say, a cute little miniature of a case. It's $4,500. And sometimes you worry about court wasting the judge's time on a $4,500 case. But there's a point that has to be made here when you have an administrative agency that it senses it's 40 and then, you know, it goes out and, in my mind, makes up a new definition, because there's nothing in there in the EPA resume that says if you clean something up, that means you've got control. It doesn't mean you can clean something up without control. So now then, a person that has claims in a position, I didn't do it, I didn't have control of it. If I don't go clean it up, then the potential liabilities run. If I don't clean it up, now the EPA says, see, you can control it because you did it. So, Your Honor, we would ask that you reverse the decision and dismiss the case with prejudice. Thank you. Thank you. Are there any questions? None. Thank you. Thank you, Your Honor. This Court should affirm the decision of the Pollution Control Board because it was not against the manifest weight of the evidence. What evidence do you have? The evidence of Mr. Reichert's control over the property was that he... If you own the property, you have control. If you own the property, inherent in ownership is control. Does a lessee have control? Well, in the lessee context, in the lessor-lessee context, the property owner, that's going to be unique to that situation. All property is unique and all lessor-lessee relationships are unique. So in other words, it's kind of an absolute liability case? I don't want to say absolute liability. Section 21 has very broad liability. Well, let's assume that you have a farm. And, you know, you get the crops. And somebody takes a truck and dumps a load of stuff out there. So do you call somebody and say, it's your farm, clean it up? You're open dumping? That is open dumping, Your Honor. So it's absolute liability. Is that what you're saying? It is absolute. Well, in that sense, yes. It's not strict liability. Why not? Because there are ways. If you, in fact, did not have control over that property. Well, you do. You own it. Well, then you are. Then you bought it. The General Assembly has said. So you should. How do you keep people from going on your property and dumping? There are cases. Do you have a duty to do that? There is an exception where you have taken preventative measures to stop open dumping. That's after the first dumping? Or any property in Illinois? Presumably any. This was a tenant. Well, I don't think the record is that clear on whether the tenant was in possession at that time of the violation. If there was no sign up there, That's why the investigator was confused about who to serve a citation on. Because she saw one tenant there, Airgas, and she knew who the property owner was. Now, have you been in private practice? I have. Okay. Have you done any leases of property? I've seen some leases, yes. Okay. Well, because when I was running a lease, I just put in there that they do not violate any law, statute, or constitution of the state of Illinois. So that's interesting. So if they're still a tenant, you got some out. But you say no, it's two people are liable? The people that own the land and the people that have the lease? Yes. Well, no, I'm sorry. If that contractual provision were at issue, the board would consider that, whether that relinquished all control to the third-party lessee, or whether the lessor retained some control of the property. And that was the case in Biddle, the EPA versus Biddle case that has been cited throughout the briefs. There was a provision in that lease that said the lessor doesn't take control of the property until it's aware of environmental violations. And that's how they ---- They don't take control of the property until after the violation. Until I've noticed the knowledge of violations of environmental violations. Well, my point is, how are you going to find out about it? That would depend on the facts. And the board would have to determine who had knowledge when of that. And property owners, because the liability is broad under Section 21. Well, what I'm getting at is, what does an Illinois farmer do? This is a hard place, because say you're along the side of the highway. Somebody throws off a mattress. So you ride them up. He doesn't even know it's there. The Illinois General Assembly has made the determination that property owners are in the best position to control their property from environmental violations. Okay, so that's a ---- They put the onus on property owners who are in control of their property to ---- So it's best to own property and not be in control of it? Is that what you're saying? Well, if you own the property, you are in control. Well, no, I'm saying could you put something in the lease? Even though I own it, I don't control it. You control it 100%. You could contract that way. So then that would be a good defense if you file some action against a guy that owns the property? That would be ---- That is something the board has considered before and found no liability on the property owner, yes. Do you have a cite on that case? Sure, it's the Biddle case. Biddle? Biddle. It's cited throughout the briefs. We got it in your brief, I didn't find it. Yeah, it's ---- I just didn't know which case it was. Biddle, there's a companion case that's roughly around the same time. Castellari with the opposite outcome happened in that case where the landowner did develop sufficient knowledge of an environmental violation and the lease didn't save the property owner in that case. So it can come out both ways. It's very fact dependent on when the owner has control. Just because you lease land doesn't mean you've relinquished all control. And the control we're talking about in this case is an area behind this warehouse. I understand that. I'm just worried about the forearmer. But if it's a trespasser that does something, does that have any effect or is he still liable for that too? You are not also liable. So under, you can, if you have taken extensive precautions to prevent vandalism. Like what? In open dumping cases, sometimes it's a fence. Well, most of the property in Illinois is maybe fenced if there's livestock, but otherwise it's not fenced. Should they fence it and that would protect them? That's what I'm trying to figure out, what to tell the forearmer. That would be. Fence your property even though you don't have any cattle. That's what you're saying? That would be a good precaution against vandalism if they think vandalism is something that happens. But it could be just that property owners are in the best position to prevent these violations. These are administrative. But you're using satellites. I don't have a satellite. I don't think those. Is this a satellite case? I appreciate that. Oh, a Google image satellite? Yes. I don't know how they first discovered the pollution back in May, but they investigated it in October and then investigated it again in November, and that's the citation we're talking about. These are meant to be, these administrative enforcement actions are meant to be rather streamlined, simple administrative hearings, violations. And I know this invites a lot of hypotheticals. When does a property owner have control? All those facts I think would be something that the board would need to determine in every case, and what we know in this case is that the property owner still had control over that part of the property. Okay, now when you say the property owner has control, does that control against people coming on your property? Because most of these farms are out in the middle of no place. So how could you have control if you can't even control people coming on your property? That's what I'm trying to get at. If you are the property owner, with ownership comes responsibility. So even if you shouldn't have a piece of farm that you don't have somebody out there that can run them off. The reason I'm getting to this is, I have a farm, but I live on it. So a truck came out there and dumped some stuff on the farm. So I get notice, clean up your, you don't have a license to have a dump. So I had to get a D9 cat out there, dig a hole, bury the stuff or whatever they did to it, I don't know, it's gone. That went cheap. But you're saying that I was liable. As the property owner, you... I'm 10 miles away from the farm. Should I hire somebody to stand guard so I don't get an action by the Illinois Bureau or whatever it is? That's what I'm trying to get. What do I do, I want to know as a lawyer, what do I do to protect the client? If you own land that you are not actively policing or controlling, then you are going to be liable for people who dump garbage. So you're saying strict liability for anything. See, because I flew over, I'm a pilot, so I flew over to the farm, and somebody dumped one of those machines that you buy newspapers from, to get the money out, and then they dumped it in the middle of the farm. Had I not been a pilot, I wouldn't have known it was there, but that's dumping. So I could have been liable, right? If you had taken some preventative steps. Look what I did. Signs, fences, those are the kind of... They don't have cattle anymore. No trespassing signs, I'm not... I did trespassing signs, they tear them down. And no hunting signs, they tear them down. So I'm still at fault because I own land. I don't have a great answer to that scenario. What do I tell my clients? That if you exercise control over property, then you are liable unless... What is my control? Your control can be in ownership. In your hypothetical, you're talking about personal, but your own property. You're not leasing it. No. Well, the farmers come in here with a tray, they want to put the weed in or the beans or corn. That's it. Well, the way out of it, I suppose, is you are liable unless you lack capability, the capacity to control the pollution source, which I don't think is that issue in that hypothetical, or secondly, you've taken some preventative measures to prevent pollution or environmental violations on the property. And whatever precautions you take, that's something the board is going to consider if they issue you a ticket. Counsel, what about what Mr. Osmond stated? Well, look, the board found control by virtue of the fact that his client cleaned up the property after he was given notice. I mean, that sounds like no good goes unpunished to me. I appreciate the catch in that. But if he is the lessor of the company, of the unit, and he has leased it out and given control over to a lessee, then he, and if he didn't in fact have control and he would breach a lease or something like that, then he doesn't have control. But if you have control, you are going to be liable for the violation. So he did, it was good that he went out. One, I know it demonstrated his control, but it prevented further violations, further administrative citations, so he capped liability. But if there were someone else who had control of the property, he would have directed that lessee, that third party, say, hey, I have an administrative citation for this burning that you did or somebody did. You have control of the property. You clean it up. Is the record clear about whether this tenant, it was a satellite company that was a tenant, that at the time Ryker got the notice and cleaned up the property? Do we know from the record was this tenant still on the property in I guess unit B? I don't think that, that's not clear from the record. I agree that's not clear because when the investigator went out, she saw one tenant, one sign up on the building. She didn't, I don't think she realized there was a second business there. And there's, in her investigative report, which is not hearsay, the portion of it that's not hearsay is a fire protection company had moved in at some point. But there's also Mr. Ryker's testimony that somebody, that it was under a lease at the time. So it's really unclear. The board, looking at all that, said we don't even need to get into that because we have the property owner who exercised control of the premises where the pollution occurred. That's sufficient. That's well within the bounds of the law. And that's why they found him liable. I do want to reiterate the point on the hearsay. Hearsay was never part of the agency's case before the hearing officer. It was not relied on by the board's decision, which is the decision on review here. And so, as I pointed out, it came out at cross-examination. It's also contained, there's some hearsay, in the investigator's field report. But the investigation is not on review. That cross-examination testimony did not form the basis of any violation here. And the only question is, did the partnership demonstrate control? Through its owner and manager, James Ryker, they had control of this area's property. The finding that he exercised control is not against the manifest way of the evidence. The opposite conclusion on this record is not clearly evident. For those reasons, the decision is well within the bounds of the law. And if there are no further questions, we ask that you affirm the decision of the Pollution Control Board. Thank you. Thank you. Mr. Osborne. Thank you, Your Honor. Very quickly, the testimony of Mr. Ryker in regards to the control and the lease. And the lease, the operative time, the lease would be important, would be the time of the violation, not the time that they inspected it. The record's not clear exactly when the satellite company left or whatever, but it is clear that Mr. Ryker stated, and his testimony is, when they asked him what his duties were, he said, I lease the property to them, you know, I answer their questions, and I leave them alone. That's his testimony. Now, in regards to the lease and the breach of the lease by him going in and cleaning it up is of no moment to this Court. If, in fact, which we believe it was, it was the lease, and he went in, and he breached the lease with the tenant in order to clean it up, it's of no moment to this Court. That's a contract issue between them. If that tenant believes that he's been violated, and for some reason, by coming in and cleaning up an EPA, that that's some kind of a breach of his lease, let him have at it. Go to the Court and sue Mr. Ryker on it. It should not even be considered in this Court because that's hypothetical, number one, and number two, he can certainly clean it up and breach the lease, which what any sane person would do or any sane attorney would tell somebody to do. Thank you. Thank you, Counselor. We will take that under consideration and issue a ruling as soon as possible. That concludes this afternoon's case and step oral argument, and we have some cases that are not oral in nature that we will discuss and get those rulings out as well. Thank you all very much. The court will rise.